# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Daniel Woldt,

        Plaintiff,

v.

Murray County Medical Center and
Meldon Snow, individually,

        Defendants.

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

Court File No. _____

Plaintiff Daniel Woldt, by and through his undersigned attorneys, and for his Complaint alleges as follows:

## PARTIES

1.    Plaintiff Daniel Woldt ("Plaintiff") is an individual residing at 3009 Tamarack Avenue, Slayton, MN 56172. Plaintiff was employed as a certified Physician's Assistant by MCMC from approximately 1999 to April 23, 2013.

2.    Defendant Murray County Medical Center ("MCMC") is a health care center owned and operated by the County of Murray, with a primary address of 2042 Juniper Avenue, Slayton, MN 56172.

3.    Defendant Meldon Snow ("Snow") is an individual residing, on information and belief, at 1430 State Highway 30, Slayton, MN 56172. At all relevant times, Snow was employed as the Chief Executive Officer ("CEO") and Hospital Administrator of MCMC.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3732 and

24 U.S.C. § 1983 because this action arises under the False Claims Act, 31 U.S.C. § 3729

et seq., ("FCA"), and 42 U.S.C. § 1983. This Court has supplemental jurisdiction to hear

this Complaint and adjudicate Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants conduct

business within this district, all or a substantial part of the events or omissions giving rise

to the claims set forth in this Complaint occurred in this district, and the employment and

investigation records relevant to these claims are, on information and belief, maintained

and administered at the offices of MCMC in this district.

## FACTUAL ALLEGATIONS

Plaintiff's Employment at MCMC.

6.      Since 1999, Plaintiff has worked for MCMC or related entities as a certified

Physician's Assistant.

7.      On February 3, 2006, Plaintiff entered into a three-year employment

agreement with MCMC, which was to continue for a period of three years and be

"automatically extended for additional one-year terms" after the expiration of the initial

three-year term.

8.      Under Section 10 of the contract, MCMC was permitted to unilaterally

terminate Plaintiff's employment agreement only upon the occurrence of Plaintiff's

disability; MCMC's insolvency; "[t]he revocation or suspension of Plaintiff's license and

registration as a Physician's Assistant in the State of Minnesota"; "[t]he expulsion,

suspension or disciplinary action of Plaintiff as a final action of any professional or scientific organization"; "[t]he resignation of Plaintiff from any professional or scientific organization while under threat of disciplinary action"; "[t]he conviction of Plaintiff of any crime punishable as a felony involving moral turpitude or immoral conduct"; or "[u]pon the loss of Supervisory Physicians and in the event that MCMC is unable to obtain replacement Supervisory Physicians." The contract also provided that it could be terminable by "mutual agreement" upon 90 days written notice.

9.     During his 14-year career with MCMC, Plaintiff received positive performance reviews and earned an excellent reputation among both patients and colleagues.

Defendant Snow Threatens Plaintiff after Plaintiff Shares Concerns about Snow with Community Members.

10.    In or around February 2006, Defendant Snow was hired to be MCMC's CEO and Hospital Administrator.

11.    Prior to Snow's hire at MCMC, Plaintiff conducted due diligence on Snow to assess his candidacy for the CEO position.

12.    Knowing that Snow was previously employed as CEO at West Holt Memorial Hospital ("West Holt") in Atkinson, Nebraska, Plaintiff spoke with a doctor in Nebraska about Snow's leadership there.

13.    The doctor warned Plaintiff that Snow had made unsubstantiated accusations of serious misconduct and/or illegal activity against several West Holt health care providers after the health care providers had voiced their opposition to Snow on

3

minor issues. The doctor stated that Snow's accusations created a divide within the hospital, fostering hostility between the providers and management.

14.     The doctor also told Plaintiff that Snow ultimately resigned from his position as West Holt's CEO, but left the hospital financially weakened. After Snow's resignation, according to the doctor, Sanford Health System assumed management of West Holt.

15.     Sanford Health System ("Sanford") is a non-profit health care system headquartered in Sioux Falls, South Dakota. It is comprised of hospitals, clinics, long-term care facilities, a health plan, a foundation, and several research centers. Widely considered the nation's largest non-profit rural health care provider, Sanford, on information and belief, has a presence in South Dakota, North Dakota, Nebraska, Oklahoma, Iowa, California, Oregon, and Minnesota.

16.     Members of the Murray County community have long held concerns that a Sanford takeover of MCMC would result in numerous lost jobs and a drastic reduction in the medical services locally available.

17.     Out of concern for MCMC and his community, Plaintiff discussed Snow's history at West Holt with several members of the MCMC Board of Directors ("MCMC Board") and his colleagues.

18.     Approximately two or three weeks after Snow's employment at MCMC began, he physically confronted Plaintiff at MCMC. He put his face close to Plaintiff's, told Plaintiff that he heard Plaintiff had been talking with people in Nebraska, and warned that Plaintiff "better watch [his] step."

4

**Plaintiff Reports Medicare Fraud and Deficient Patient Care by Two MCMC Doctors, but MCMC Does Nothing.**

19.     On information and belief, several of MCMC's doctors are participants in the U.S. State Department's non-immigrant Exchange Visitor Visa ("J-1 Visa") program, and MCMC serves as a domestic sponsor for these individuals.

20.     In or around October 2012, Plaintiff had a scheduled appointment with a returning MCMC patient. The patient was returning for a follow-up appointment because her symptoms had persisted after being diagnosed and treated by an MCMC internal medicine doctor ("internist").

21.     By referencing the patient's electronic medical record ("EMR"), Plaintiff and the patient were surprised to find that the internist's dictations in the patient's EMR described an examination that never actually occurred.

22.     Around the same time, two more patients informed Plaintiff that a different MCMC internist had misrepresented the services he performed on the patient's EMR.

23.     In his respective appointments with these three patients, Plaintiff determined that they had all received deficient medical care and were misdiagnosed by the internists.

24.     Medicare is a federally-funded health insurance system for eligible persons, including persons with disabilities and persons over 65. A healthcare provider participating in the Medicare program is reimbursed for the reasonable cost of services provided to Medicare patients.

25.     According to MCMC's website, MCMC relies in part on revenue from the Medicare program to "run the hospital and its clinics."

26.     On information and belief, MCMC provides the Secretary of Health and Human Services, or a fiscal intermediary, with information regarding services provided to Medicare patients in order to be reimbursed for the reasonable cost of those services.

27.     On information and belief, MCMC relied on the two internists' fraudulent dictations in providing the Secretary of Health and Human Services, or a fiscal intermediary, with information regarding services provided to Medicare patients in order to be reimbursed for the reasonable cost of those services.

28.     Accordingly, Plaintiff reasonably believed that MCMC was committing Medicare fraud as a result of the conduct of the two internists.

29.     On two occasions between approximately October and December 2012, Plaintiff reported the conduct of the two internists to MCMC's Chief of Staff, Dr. Joyce Tarbet ("Tarbet").

30.     Plaintiff told Tarbet that the two internists had fraudulently written dictations in patients' EMRs, where they claimed to have provided treatment that was not actually received by their respective patients.

31.     Plaintiff told Tarbet that he believed the two internists were committing "Medicare fraud" and seriously compromising patient care.

32.     On information and belief, both of the internists Plaintiff reported were J-1 Visa holders sponsored by MCMC.

6

33.     Neither of the MCMC internists implicated by Plaintiff's reports was placed on administrative leave between October and the end of 2012. On information and belief, MCMC did not investigate their conduct to determine whether Medicare fraud had occurred.

34.     In or around December 2012, one of the patients described above in paragraphs 14 through 17 asked Plaintiff whether MCMC had addressed the concerns she had raised about the internist's fraudulent dictations and the deficient care that was provided. Plaintiff told the patient that he had reported the activity to the Chief of Staff and it did not appear Plaintiff's reports had triggered action from MCMC. Plaintiff suggested that the patient to speak to Snow directly about her concerns. The patient stated that she intended to do so.

Snow Falsely Accuses Plaintiff of Medicare Fraud.

35.     On or about January 8, 2013, two patients, who were spouses, were scheduled for medical appointments with Plaintiff at MCMC.

36.     While one patient was scheduled for a morning appointment and the other was scheduled for an afternoon appointment, the patients requested that Plaintiff see them both at the same time. Plaintiff granted their request.

37.     Plaintiff's dictation in the patients' EMR accurately states the time of day that the patients were treated.

38.     After the appointment, Plaintiff informed Medical Assistant Sandy Hoekman ("Hoekman") that he had seen and treated both patients.

7

39.     Hoekman informed Plaintiff that she would nevertheless leave the afternoon appointment in Plaintiff's schedule to ensure that MCMC would have an appointment opening available for any last-minute emergency patients.

40.     Hoekman indicated that she had informed Scheduler Tammy Ryan ("Ryan") that this appointment slot was available, and that the appointment slot could be filled with a patient requiring emergency care.

41.     Plaintiff spoke with Ryan, who verbally confirmed that she understood that the appointment slot was available, and could be filled with an emergency patient, should the need arise.

42.     This scheduling practice is not uncommon among health care providers at MCMC.

43.     On January 14, 2013 during work hours, Snow confronted Plaintiff. During the confrontation, Snow accused Plaintiff of committing "Medicare fraud," referring to the unaltered January 8, 2013 patient schedule and Plaintiff's dictation in the EMR indicating that both patients were seen at an earlier time. Snow said that Plaintiff could lose his license forever for such fraudulent activity.

44.     Plaintiff was shocked by Snow's accusations. He explained the events of January 8, 2013 and denied any wrongdoing.

45.     In the same conversation, Snow told Plaintiff that the MCMC Board had, at the recommendation of MCMC's attorney, unanimously voted to fire Plaintiff and Hoekman due to their "fraudulent conduct."

8

46. He also stated that the MCMC Board had accused Plaintiff of various performance problems, including coming into work late and leaving early, not being a "team player" by refusing to double-book, and generating the lowest revenues of all MCMC health care providers.

47. Plaintiff expressed surprise that the MCMC Board—several of whom he had worked with for years—had come to such a hasty decision based on a routine scheduling matter. Plaintiff explained why each of the accusations of performance problems was inaccurate.

48. Snow stated that he was not going to fire Plaintiff because the MCMC Board had not consulted Snow before making its decision. Rather, he told Plaintiff that he would have to go on "probation" while MCMC investigated Plaintiff.

49. On or about January 15, 2013, Snow approached Plaintiff in the hospital hallway and asked him repeatedly if Plaintiff was angry with him. Snow grabbed Plaintiff's arm and chest-bumped him, saying that Plaintiff should not "do anything stupid" and should "take some probation" for what he had done. He warned Plaintiff that Plaintiff could not afford to lose his job, as he would not be able to earn the same income with a different health care provider. Snow told Plaintiff that he would be "mad as hell" if Plaintiff chose to discuss the situation with anyone. Snow concluded the conversation by repeatedly bumping Plaintiff in the chest, yelling, "Are you on board with that" each time he made contact.

Snow Tells MCMC Board Members that Plaintiff Committed Medicare Fraud and Suffered from Various Performance Problems, and Encourages Them to Fire Plaintiff.

50.   On information and belief, on or about January 15, 2013, Snow approached MCMC Board member Lynn Johnson ("Johnson") at her place of business, and outside of an official MCMC Board meeting, to discuss Plaintiff's alleged fraud and misconduct.

51.   He told Johnson that MCMC's lawyer had determined that Plaintiff engaged in a recurrent pattern of fraud.

52.   He told Johnson that Plaintiff had been coming into work late, leaving work early, was not a "team player", and was the lowest-producing revenue provider on MCMC's staff.

53.   Snow further told Johnson that the MCMC Board needed to terminate Plaintiff immediately, and that the other MCMC Board members had already agreed to terminate Plaintiff.

54.   On information and belief, on or about January 16, 2013 Snow contacted MCMC Board member Connie McNabb ("McNabb"), outside of an official MCMC Board meeting, to tell her about Plaintiff's alleged fraud and misconduct.

55.   Snow told McNabb that Plaintiff had been involved in fraudulent activity, had been coming into work late and leaving early, was not a "team player," refused to double-book patients, and was the lowest revenue producer of all of MCMC's health care providers.

56.   Snow encouraged McNabb to approve Plaintiff's immediate termination.

57.   Snow's statements to Johnson and McNabb were false.

MCMC Places Plaintiff on a Nine-Week Administrative Leave.

58.     On January 21, 2013, while Plaintiff was at work, MCMC notified him he was being placed on administrative leave immediately, pending an investigation. Plaintiff was escorted out of the hospital.

59.     Plaintiff's administrative leave lasted more than nine weeks, from approximately January 21, 2013 to March 27, 2013, during which time he was prohibited from treating patients or discussing the circumstances surrounding his administrative leave with any MCMC employees.

60.     Tarbet interviewed Plaintiff as part of the investigation into his conduct. Plaintiff again explained what had occurred with respect to the scheduling discrepancy on January 8, 2013.  Plaintiff explained the events of January 8th again, and also described his interactions with Snow on January 14th and 15th.

61.     Plaintiff reminded Tarbet about his own reports of Medicare fraud, and inquired whether MCMC would also be investigating the internists.  Tarbet told Plaintiff that the internists had been "talked to" about their conduct.

62.     On or about January 22, 2013, the MCMC Board held a meeting to discuss Plaintiff's administrative leave and investigation.

63.     Prior to the meeting, Snow attempted to persuade Plaintiff that it would be better to conduct the Board meeting in private and deny community members the ability to observe the proceedings.

64.    Plaintiff told Snow that he had committed no misconduct whatsoever and felt that the circumstances surrounding the decision to place him on administrative leave were a matter of great public concern to local community members.

65.    Plaintiff insisted that the Board meeting be open to the public.

66.    Despite Snow's efforts, the MCMC Board ultimately agreed to hold an open session meeting on January 22, 2013.

67.    At the meeting, MCMC's attorney, Ann Goering ("Goering"), announced that the investigation remained in its "very early stages," that there was only "preliminary confirmation of one instance" of misconduct on Plaintiff's behalf, and "no evidence" that the conduct had occurred more than once.  She asked the MCMC Board to ratify an extension of Plaintiff's administrative leave so that they could further investigate Plaintiff, which the MCMC Board did.

Murray County Divides between Supporters of Plaintiff and Supporters of Snow, and Defendants Instruct Employees Not to Speak with Anyone.

68.    Plaintiff's administrative leave triggered public controversy over Snow's management of MCMC and MCMC's future.

69.    Several articles and editorials were published in local newspapers about Plaintiff, Snow, MCMC's management of the investigation, and MCMC's future.

70.    For example, during Plaintiff's administrative leave, a letter expressing support for Snow ("Snow Support Letter") was circulated at MCMC and subsequently published in the local paper. Some employees signed the letter; others did not.

71.     At the January 22, 2013 MCMC Board meeting, at least one community
member asked the MCMC Board whether Sanford would be taking over MCMC.

72.     Despite the public concern, Defendants MCMC and Snow instructed
Plaintiff and MCMC employees on multiple occasions: not to discuss the investigation or
related matters with anyone; that it was "illegal" for MCMC staff to discuss the
investigation or related matters with anyone; that the matter was now a "federal case";
and that it was "illegal" for MCMC staff to listen to the recorded audio of the February
26, 2013 MCMC Board meeting.

<u>Snow Continues to Publish False Statements about Plaintiff.</u>

73.     During Plaintiff's administrative leave, Snow made several false
accusations about Plaintiff to MCMC employees, including but not limited to the
following:

    a.     On the first day of Plaintiff's suspension, Snow told an MCMC
nurse practitioner, Stacy Slettum ("Slettum"), that Plaintiff had committed fraud.  He
denied that the investigation into Plaintiff was triggered by the isolated scheduling
discrepancy on January 8, 2013, claiming that the fraud concerns were "more" than just
one incident, and accused Plaintiff of "doctoring the computer" to erase evidence of other
incidents where he had misrepresented his schedule.  He also said that Plaintiff had a
habit of arriving late and leaving early.

    b.     In a meeting with several MCMC health care providers on or about
January 30, 2013, Snow announced that Goering believed Plaintiff's actions were
"fraud."

c.      Snow told another MCMC nurse practitioner in a one-on-one meeting that Plaintiff had committed Medicare fraud.  When the nurse practitioner asked Snow to explain how Plaintiff had committed fraud, Snow refused, stating that it would be illegal for him to reveal any specific information.

d.      Snow told Hoekman, with whom Plaintiff had worked for over 14 years, that Plaintiff wanted to fire her.

e.      On information and belief, Snow told multiple MCMC Board members, outside of an official MCMC Board meeting, that Plaintiff had committed fraud, that Plaintiff's fraudulent activity had been going on for a long time, and that the MCMC Board members should terminate Plaintiff's employment.

f.      On information and belief, Snow told individuals that Plaintiff had sought to get Snow fired in 2006 when Snow was first hired.

74.     Snow's statements to these individuals were false.

75.     In addition to making false accusations to undermine Plaintiff's reputation, Snow made other improper attempts over the course of Plaintiff's administrative leave to strong-arm MCMC Board members into terminating Plaintiff's employment.  For example, on information and belief, he told McNabb that several MCMC providers would resign if Plaintiff was reinstated.

76.     On information and belief, Snow also told MCMC employees that Sanford had positions available for anybody who planned to resign if Plaintiff was reinstated.

MCMC Reinstates Plaintiff upon Concluding that He Committed No Fraud or Misconduct.

77.    On or about March 26, 2013, the MCMC Board held a meeting during which it announced that the investigation had concluded. Finding that Plaintiff had done nothing that would warrant disciplinary or legal action, the MCMC Board voted to reinstate Plaintiff to his position

Snow Creates an Intolerable Working Environment for Plaintiff, Forcing His Constructive Discharge.

78.    After returning to work on March 27, 2013, Plaintiff's work environment became intolerable.

79.    Snow held at least four meetings where he made misrepresentations to MCMC employees about the events of the March 26, 2013 MCMC Board meeting and published false and disparaging statements about Plaintiff:

a.    On the afternoon of March 26, 2013 following the Board meeting, Snow held a meeting with several MCMC health care providers, during which he was visibly angry. Snow told attendees that Plaintiff had been reinstated, but that the community - not the MCMC Board - had made the decision. He reiterated that Plaintiff had, in fact, committed Medicare fraud, but said that the MCMC Board had not properly investigated the fraud. He further ranted that people could "do as they please around here and get away with it" and that it appeared it would be "Dan's private practice from here on out" because he could do no wrong.

b.    Snow held another meeting on March 27, 2013 with MCMC department managers who had signed the Snow Support Letter. On information and

belief, Snow again accused Plaintiff of fraud, claimed that the "worst" findings of the investigation were not shared at the Board meeting, and told the attendees to scrutinize Plaintiff's conduct and "document" their observations of Plaintiff so that they could report them to Snow.

        c.    At another meeting later on March 27, 2013, Snow told MCMC providers that the March 26, 2013 MCMC Board meeting had been very hostile – that the crowd had bullied Snow, booed him, and told him to leave the meeting. Snow said that when he and other hospital officials attempted to speak, a community member threatened to beat their heads in. Snow further stated that Lynn Johnson bullied other Board members at the meeting so that the real findings of the investigation could not come out. He claimed that the investigation revealed more than the one instance of fraud. When asked what those findings were, Snow claimed that he could not disclose them.

        d.    On March 28, 2013, Snow held another meeting with MCMC department managers who had not signed the Snow Support Letter. He admitted that he had been devastated and angry with the MCMC Board's decision to reinstate Plaintiff, but claimed he would be putting it behind him. When asked by an attendee why Snow had split up the department managers for the two meetings, Snow claimed that his secretary had scheduled the two meetings that way due to managers' scheduling conflicts.

        80.    Snow's statements described above were false.

        81.    On information and belief, Snow made false statements about Plaintiff similar to those described above to individuals in private meetings.

82.     After Plaintiff's return to work, many of Plaintiff's colleagues—with whom he previously enjoyed a positive working relationship—treated him with visible hostility and suspicion.  Those colleagues who still spoke with Plaintiff believed their employment was at risk merely because of their affiliation with him.

83.     On April 2, 2013, Plaintiff informed MCMC that his work environment had become intolerable, and requested that MCMC release him from the 90-day notice provision for termination of his employment agreement.  Plaintiff requested the same in writing on April 3, 2013.

84.     On April 23, 2013, MCMC notified Plaintiff by email that his "resignation ha[d] . . . been accepted."

85.     Since Plaintiff had not received a response to his request regarding the 90-day notice provision, Plaintiff arrived for work on April 24, 2013.

86.     MCMC escorted Plaintiff out of the building.

## CAUSES OF ACTION

### COUNT I
### FALSE CLAIMS ACT RETALIATION
### (Defendant Murray County Medical Center)

87.     The allegations made in the preceding paragraphs are realleged.

88.     The False Claims Act, 31 U.S.C. § 3730(h)(1), provides that:

Any employee ... shall be entitled to all relief necessary to make that employee ... whole, if that employee ... is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of other efforts to stop 1 or more violations of this subchapter.

89.     Plaintiff engaged in several lawful acts to stop violations of the False Claims Act, 31 U.S.C. § 3730, including reporting to MCMC that two of its internal medicine doctors were engaged in Medicare fraud.

90.     Defendant MCMC threatened, harassed, suspended, constructively discharged, and otherwise discriminated against Plaintiff because of Plaintiff's efforts to stop False Claims Act violations.

91.     As a result of Defendant MCMC's violations, Plaintiff has suffered loss of past and future income, past and future mental anguish, emotional distress, humiliation, reputational harm, embarrassment and other damages in an amount exceeding $75,000. Plaintiff is also entitled to his attorneys' fees and costs on this claim.

**COUNT II**
**DEPRIVATION OF FREE SPEECH IN VIOLATION OF 42 U.S.C. § 1983**
**(Defendants Murray County Medical Center & Meldon Snow)**

92.     The allegations made in the preceding paragraphs are realleged.

93.     Plaintiff spoke publicly, as a citizen, when he discussed several matters of public concern with Murray County community members, including but not limited to: Snow's history of mismanagement at West Holt, the risks Snow posed to the expenditure of public resources, the risks Snow and his management posed to jobs and medical services in the community, the circumstances surrounding his investigation and administrative leave, and the substandard care of MCMC patients. Plaintiff's right to speak out freely on these and other matters of public concern is protected by the First and Fourteenth Amendments of the United States Constitution.

94.     Upon learning that Plaintiff had spoken out on such matters of public concern, Defendants, individually, separately, and/or jointly, engaged in actions and decisions aimed at denying Plaintiff's employment rights and protections granted to him under the law.

95.     These actions and decisions were designed to cause, and have caused, Plaintiff to suffer numerous adverse employment actions, humiliation, harm to his reputation, emotional and mental injuries, pain and suffering, and financial and other adverse consequences, for which he seeks full damages in excess of $75,000.

96.     Such actions and decisions of Defendants, individually, separately, and/or jointly, were taken in response to, in retaliation for, and in order to chill, Plaintiff's exercise of his constitutional and lawful right to speak out about matters of public concern, in violation of his rights under the First and Fourteenth Amendments of the United States Constitution.

97.     Such actions and decisions of Defendants, individually, separately, and/or jointly, were taken under color of law, and have deprived Plaintiff of his rights, privileges and immunities secured by the United States Constitution and laws, in violation of 42 U.S.C. § 1983.

98.     Such actions and decisions of Defendants make the Defendant MCMC fully liable to the Plaintiff under 42 U.S.C. § 1983 based on the authority and actual decisions of Defendant Snow.  In addition, such unlawful actions and decisions, as alleged herein, were based on the policymaking and final decision-making authority of Defendant MCMC and were based on the policy, custom, and practice of MCMC.

99.     Plaintiff is entitled to punitive damages on these claims because Defendants' above-alleged actions, individually, separately, and/or jointly, were done in a knowing, willful, reckless manner and in bad faith.

100.    As a result of Defendants' violations of 42 U.S.C. § 1983, Plaintiff is entitled to his attorneys' fees and costs.

**COUNT III**
**DEFAMATION**
**(Defendants Murray County Medical Center & Meldon Snow)**

101.    The allegations made in the preceding paragraphs are realleged.

102.    Defendants intentionally and maliciously published false and defamatory statements about Plaintiff.   These defamatory statements are described in earlier paragraphs of this Complaint, and include the following:

  a.     Statements that Plaintiff had been involved in fraudulent activity;

  b.     Statements that Plaintiff had committed fraud;

  c.     Statements that Plaintiff had committed Medicare fraud;

  d.     Statements that Plaintiff engaged in a recurrent pattern of fraud;

  e.     Statements that Plaintiff's investigation had been triggered by more than the isolated scheduling discrepancy on January 8, 2013;

  f.     Statements that Plaintiff doctored his computer or altered his schedule to erase evidence of incriminating activity;

  g.     Statements that Plaintiff had been coming into work late and leaving early;

20

h.     Statements that Plaintiff had a habit of coming into work late and leaving early;

i.      Statements that Plaintiff was not a "team player";

j.      Statements that Plaintiff refused to double-book patients;

k.     Statements that Plaintiff was the lowest revenue producer of all of MCMC's health care providers;

l.      Statements that Plaintiff wanted to have Hoekman fired;

m.    Statements that the MCMC Board members had agreed to terminate Plaintiff prior to his administrative leave;

n.     Statements that there were more findings from the investigation that were detrimental to Plaintiff;

o.     Statements that the "worst" offenses uncovered by the investigation were not discussed or considered by the MCMC Board in its decision to reinstate Plaintiff;

p.     Statements that the MCMC board did not bother to investigate Plaintiff's alleged fraud;

q.     Statements that Plaintiff's reinstatement was a function of Goering's inability to pursue Snow's allegations correctly or effectively, rather than a legitimate MCMC Board decision based on the results of the investigation;

r.      Statements that Plaintiff's reinstatement was a function of hostile community members present at MCMC Board meetings, rather than

a legitimate MCMC Board decision based on the results of the investigation; and

s.     Statements that Plaintiff had sought to get Snow fired in 2006 when Snow was first hired.

103.   Plaintiff's reputation has been severely damaged by Defendants' defamatory statements.

104.   The defamatory statements that Defendants published about Plaintiff affect his business, trade, profession, office and calling, and also accuse him of criminal activity; they are therefore defamation per se.

105.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages in an amount in excess of $75,000.

106.   Defendants published defamatory statements about Plaintiff with malice, reckless indifference, or deliberate disregard for Plaintiff's rights and safety. As a result thereof, Plaintiff will seek to amend this Complaint to include a claim for punitive damages under Minn. Stat. § 549.20.

## COUNT IV
## BREACH OF CONTRACT
### (Defendant MCMC)

107.   The allegations in the preceding paragraphs are realleged.

108.   Plaintiff and Defendant MCMC had a contract.

109.   Defendant breached that contract.

110.   As a result, Plaintiff suffered damages in an amount in excess of $75,000.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL AND PROSPECTIVE**
**ECONOMIC RELATIONS**
**(Defendant Meldon Snow)**

111.    The allegations made in the preceding paragraphs are realleged.

112.    At all relevant times, Plaintiff and MCMC had contractual relations and a prospective economic relationship, by virtue of Plaintiff's employment with MCMC and his relationship with his coworkers, other employers, and his patients.

113.    Defendant Snow interfered with these relations and prevented Plaintiff from continuing his prospective economic relationship with MCMC by committing the above-alleged acts, including publishing false, exaggerated, and defamatory information regarding Plaintiff.

114.    Defendant Snow committed the above-alleged facts without justification and with the intent to interfere with Plaintiff's employment and prospective economic relations with MCMC, his coworkers, other employers, and his patients.

115.    As a direct and proximate result of Defendant Snow's unlawful conduct, Plaintiff has suffered, and continues to suffer, pecuniary harm, including lost wages, benefits, and the reasonable expectation of continuing income, salary, salary increases and substantial benefits, in an amount in excess of $75,000.

116.    Defendant Snow committed the above-alleged facts with malice, reckless indifference, or deliberate disregard for Plaintiff's rights and safety. As a result thereof, Plaintiff will request the opportunity to amend this Complaint to include a claim for punitive damages under Minn. Stat. § 549.20.

23

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief:

1.    An Order adjudging the practices of Defendants to be in violation of the rights guaranteed to Plaintiff under federal and Minnesota law;

2.    An award to Plaintiff against Defendant MCMC for all relief necessary to make him whole pursuant to 31 U.S.C. § 3730(h), including but not limited to, two times his back pay, interest on the back pay, and compensation for all special damages sustained, including emotional distress, attorney's fees and costs;

3.    An award to Plaintiff against Defendants, jointly and severally, for all relief available under 42 U.S.C. § 1983, in amounts to be determined at trial, with interest on such amounts;

4.    An award to Plaintiff for all costs incurred in bringing his claims under 31 U.S.C. § 3730(h) and 42 U.S.C. § 1983, including reasonable attorney's fees;

5.    An award to Plaintiff for all relief afforded by the law for Defendants' defamation, including an award of economic damages arising from past and future income loss, all in excess of $75,000;

6.    An award to Plaintiff for all relief afforded by the law for Defendant MCMC's breach of contract, including an award of economic damages arising from past and future income loss, all in excess of $75,000;

7.    An award to Plaintiff for all relief afforded by the law for Defendant Snow's tortious interference with contractual and prospective economic relations, including an award of economic damages arising from past and future income loss and emotional distress, all in excess of $75,000;

8.    An award to Plaintiff for punitive damages in excess of $75,000;

9.    A trial by jury to be held on all of these issues;

10.   For leave to amend the Complaint to add claims for punitive damages under Minnesota law; and

11.   For such further and other relief as the Court deems just.

**NICHOLS KASTER, PLLP**

Dated:       May 13, 2013        s/James H. Kaster
                                 James H. Kaster, MN # 53946
                                     Email: kaster@nka.com
                                 Bonnie M. Smith, MN # 0391915
                                     Email: bsmith@nka.com
                                 Drew L. McNeill, MN # 0393272
                                     Email: dmcneill@nka.com
                                 4600 IDS Center
                                 80 South Eighth Street
                                 Minneapolis, MN  55402
                                 Telephone: (612) 256-3200
                                 Facsimile: (612) 338-4878

                                 ATTORNEYS FOR PLAINTIFF